IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**LAWRENCE E. COMBS,**

    Plaintiff,

v.                                                                   Civil Action No. **3:20CV563**

**T. GIDDENS,** *et al.,*

    Defendants.

## MEMORANDUM OPINION

Lawrence E. Combs, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this action. By Memorandum Opinion and Order entered on May 10, 2023, the Court referred Combs's remaining claims to the Honorable Summer Speight, United States Magistrate Judge, for an evidentiary hearing. Combs's remaining claims concerned whether he has been denied equal access to a microwave and to seating at tables at Sussex II State Prison in violation of Title II of the Americans with Disabilities Act ("ADA"). The Court held an evidentiary hearing regarding these issues on June 22, 2023. The matter is before the Court on the Report and Recommendation issued by the Magistrate Judge. For the reasons set forth below, the Report and Recommendation, (ECF No. 67), will be ACCEPTED AND ADOPTED.

### I. The Report and Recommendation Entered August 2, 2023

The Magistrate Judge made the following findings and recommendations:

#### I.     PROCEDURAL HISTORY

Plaintiff, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action. By Memorandum Opinion and Order dated May 31, 2022, the Court dismissed all of Plaintiff's claims except for Claim Four, which alleged that Defendants, Chief of Housing Operations M. Foster and Operations Manager M. Vandermark, in their official capacities, violated Plaintiff's rights under Title II of the ADA, 42 U.S.C. § 12121 *et seq.*, by denying him: (a) access to a sufficient number of wheelchair accessible showers; (b) access to safety ramps on walkways; (c) equal access to a microwave; and (d) tables suitable for wheelchair users. (ECF Nos. 30, 31.)

By Memorandum Opinion and Order entered on May 10, 2023, the Court granted in part and denied in part Defendants' Motion for Summary Judgment on the remaining Claim Four. (ECF Nos. 41, 42.) Specifically, the Court dismissed Claims Four (a) and Four (b), challenging access to wheelchair accessible showers and walkways, but found that genuine disputes of material fact precluded entry of judgment as to Claims Four (c) and Four (d), which were referred to the undersigned for an evidentiary hearing. (*Id.*) In addition, the Court dismissed Plaintiff's demand for monetary damages in conjunction with Claims Four (c) and Four (d), leaving only his demand for injunctive relief. (ECF No. 41, at 10.)

On June 22, 2023, the Court held an evidentiary hearing on the two remaining claims, which assert that Defendants violated Plaintiff's rights under Title II of the ADA by denying him equal access to a microwave and tables suitable for wheelchair users. Following the evidentiary hearing, the parties submitted post-hearing briefs. (ECF Nos. 65, 66.)[1]

## II. APPLICABLE LAW

"Title II of the ADA provides that no qualified individual shall, 'by reason of [a] disability,' be denied the benefits of public 'services, programs, or activities' or be subject to discrimination by a public entity."[2] *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020) (alteration in original) (quoting 42 U.S.C. § 12132). *See also* 28 C.F.R. § 35.152. To succeed on a claim under Title II of the ADA, a plaintiff must prove "that (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program, or activity; and (3) he was 'excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of h[is] disability.'" *Spencer v. Earley*, 278 F. App'x 254, 261 (4th Cir. 2008) (quoting *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

"The ADA permits plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact and (3) failure to make reasonable accommodations." *Richardson v. Clarke*, 52 F.4th

---

[1] At the evidentiary hearing and in post-hearing briefing, Plaintiff often raised issues outside of Claims Four (c) and Four (d). (*See, e.g.*, ECF No. 63, Transcript of June 22, 2023 Evidentiary Proceeding (hereinafter "Tr."), at 10-11; ECF No. 65.) The Court limits its analysis to the scope of the two remaining claims on referral, which require consideration of Plaintiff's access to the microwave in Pod 1A and the tables in the dining hall and pod.

[2] "Title II of the ADA requires that all public entities in the United States take affirmative steps to reasonably accommodate qualifying individuals with disabilities, as defined by the statute. 42 U.S.C. § 12132. Courts have liberally interpreted the definition of a 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a ... local government,' 42 U.S.C. § 12131(1)(B), to include state-run prisons as well as local police forces." *Waller v. City of Danville, Virginia*, 515 F. Supp. 2d 659, 662-63 (W.D. Va. 2007), *aff'd sub nom. Waller ex rel. Est. of Hunt v. Danville, VA*, 556 F.3d 171 (4th Cir. 2009). Because Sussex II is a state-run prison, it falls within this definition of a public entity.

614, 619 (4th Cir. 2022). Plaintiff bases his claims on the first and third grounds. First, he alleges that Defendants intentionally discriminated against him because of his disability by denying him meaningful access to the microwave and tables. (ECF No. 1, at 9, 11[3] (describing the lack of access as "discriminating [against] the handicap by default" and further alleging that Defendants "have in fact discriminated against Plaintiff for being disabled by not providing the necessities to properly house the handicap[ped]").) Second, Plaintiff alleges Defendants failed to make reasonable accommodations by denying his request to install "handicap and wheelchair accessible tables" and a "microwave in [the] pod." (ECF No. 1, at 13; ECF No. 1-1 (Exhibit 11), at 12-13 (asking for a microwave that is wheelchair accessible); ECF No.1-1 (Exhibit 12), at 16-17 (asking that wheelchair accessible tables be placed in the pod).)

"[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.... [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). To prevail on an ADA claim based on failure to make a reasonable accommodation, Plaintiff "'must propose a reasonable modification to the challenged public program that will allow [him] the meaningful access [he] seek[s].'" *Richardson*, 52 F.4th at 619 (quoting *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016)). "'A modification is reasonable if it is reasonable on its face or used ordinarily or in the run of cases and will not cause undue hardship.'" *Id.* (quoting *Lamone*, 813 F.3d at 507). In assessing a § 1983 claim brought by an inmate, courts "view the reasonableness of accommodations through the lens of operating a prison," which "requires some deference to those who run prisons." *Id.* at 621 (internal citations omitted).

### III. FINDINGS OF FACT

Based on the evidence and testimony presented at the evidentiary hearing, the Court makes the following findings of fact.

**A. Plaintiff's Disability and Incarceration at Sussex II State Prison**

    1.    Plaintiff is an inmate incarcerated at Sussex II State Prison ("Sussex II"). (Tr. 32.)

    2.    Plaintiff has used a wheelchair for eight years due to his emphysema. (Tr. 33-34.)

    3.    Plaintiff's condition does not preclude him from standing, walking, or sitting unassisted on occasion. (Tr. 24, 34, 113-15.) Video evidence shows Plaintiff walking around his housing unit, at times pushing his wheelchair in front of him and at other times standing unassisted. (Tr. 90-91; Defs.' Ex. 4[4].) Plaintiff explained that, roughly twice a week, he walks around for exercise and to avoid cramping in his legs. (Tr. 113-14.) But "[m]ost of the time [Plaintiff is] in [his]

---

[3] The Court cites to the Complaint and its accompanying exhibits by referencing the pages as numbered by CM-ECF.

[4] Any exhibits cited herein refer to those presented by the parties and admitted into evidence during the June 22, 2023 Evidentiary Hearing.

wheelchair." (Tr. 115.) A Medical Detail note dated October 25, 2021, states that Plaintiff needs "wheelchair assistance indefinitely." (Pl.'s Ex. 10; Tr. 112-13.)

  4. Sussex II houses inmates in pods. (Tr. 80.) Pod 1A houses around 88 inmates, including Plaintiff. (Tr. 29.) Out of these 88 total inmates in Pod 1A, 20 use a wheelchair, either temporarily or permanently.[5] (Tr. 69; Pl.'s Ex. 1, at 2.) Inmates use different types of wheelchairs, some which may be wider than others. (Tr. 27.)

### B. Plaintiff's Access to the Microwave in Pod 1A

  5. Pod 1A contains a microwave for inmate use. (Tr. 9.)

  6. The microwave was located "up high," and Plaintiff could not reach it from his wheelchair. (Tr. 9.)

  7. On June 20, 2023, two days before the evidentiary hearing, prison officials "lowered it so the people in the wheelchairs can get to it." (Tr. 9; *see also* Tr. 31-32.)

  8. Plaintiff can now use the microwave while sitting in his wheelchair. (Tr. 9.)[6]

  9. Plaintiff confirmed that "[t]he microwave situation has been resolved." (Tr. 9; *see also* Tr. 32, 70.)

### C. Plaintiff's Access to Tables in the Dining Hall

  10. Inmates in Pod 1A eat their meals together at the same time. (Tr. 23.) Mondays through Fridays, inmates typically dine at Dining Hall A. (Tr. 80.) On the weekends, inmates either get food from the dining hall and return to the pod to eat or food is delivered directly to the pod. (Tr. 80-81.) Inmates do not have a choice as to the location of their meals. (Tr. 23, 80-81.)

  11. Dining Hall A has 30[7] octagon-shaped tables. (Tr. 18-19, 22; Pl.'s Exs. 3, 4.) Each table has four stationary stools attached and extended underneath every other side of the octagon table face. (Tr. 22; Pl.'s Ex. 4; Defs.' Exs. 1, 2.)

---

[5] The parties presented conflicting evidence as to the number of inmates in Pod 1A confined to a wheelchair. Defendants contend that Pod 1A only has 16 or 17 inmates "permanently" confined to a wheelchair. (Tr. 77, 79.) Plaintiff testified that 21 inmates in Pod 1A are confined to a wheelchair but provided a list of 20 names of inmates in Pod 1A "who have been prescribed wheelchairs by medical personnel." (Tr. 19, 28; Pl.'s Ex. 1, at 2.) The disagreement in number appears to stem from the fact that some inmates may use wheelchairs on a temporary rather than indefinite basis. (*See, e.g.*, Tr. 33, 48.) Plaintiff's own witness and ADA "program assistant for the pod" identified "20 wheelchair people in the pod," with "at least 16 of them" permanently in wheelchairs. (Tr. 67, 69.) For purposes of resolving the remaining claims, the Court finds that around 20 inmates in Pod 1A use wheelchairs, either permanently or temporarily.

[6] Other inmates in wheelchairs also testified that they can access the microwave in its current, lowered position. (Tr. 51, 61.)

[7] Plaintiff testified there were 12, 24, or 30 tables in Dining Hall A. (Tr. 19, 21.) He acknowledged that Dining Hall A has enough seating for 88 people. (Tr. 19.) Plaintiff also presented a diagram of Dining Hall A, received into evidence, which shows 30 tables. (Tr. 18-20; Pl.'s Ex. 3.) Defendant Vandermark, a senior administrative staff specialist at Sussex II (Tr. 71), did not know the number of

    12.    Defendant Vandermark testified that the tables "fall under the ADA guidelines." (Tr. 76.) According to her, Sussex II, "just like all state facilities," has "a statewide ADA coordinator who makes sure that [the tables] are accessible." (Tr. 76.)

    13.    Three tables within Dining Hall A have one of the four stools removed for wheelchair accessibility. (Tr. 72.)[8] At the locations with the removed stools, Plaintiff can sit in his wheelchair and reach the table without scooting up in the seat of his wheelchair. (Tr. 23-24.)

    14.    Plaintiff cannot slide his wheelchair over the built-in stools at the tables in Dining Hall A. (Tr. 24, 25, 36, 37.)[9]

    15.    Plaintiff can sit in his wheelchair at the four sides of the table between two built-in stools and reach the table, but he says "that ties up, you know, two other places where people could eat"—the two built-in stools immediately adjacent to his wheelchair. (Tr. 24.)[10]

    16.    Plaintiff can also sit on top of a stool without the use of his wheelchair, "but most of the time [he] stay[s] in the wheelchair." (Tr. 34.) He sits directly on the stools "maybe once a week." (Tr. 114.)

**D. Plaintiff's Access to Tables in Pod 1A**

    17.    When the inmates eat in Pod 1A, they can sit in the pod's common area. (Tr. 80-81.) Pod 1A's common area contains 10 octagon-shaped tables,

---

tables in Dining Hall A but also testified that "the dining hall will seat approximately 88 inmates," which means there must be at least 22 tables (Tr. 72). Because the parties acknowledge that the dining hall has sufficient seating for at least 88 inmates and based on the diagram of Dining Hall A (Pl.'s Ex. 3), the Court finds that Dining Hall A has 30 tables.

[8] Plaintiff testified that there is one table in Dining Hall A with one or two stools removed (Tr. 17, 20, 23, 37), and another inmate testified that two tables in Dining Hall A each have one stool removed (Tr. 69). Defendant Vandermark testified that Dining Hall A has three tables, each with one stool removed, and identified photographs of each of those three tables. (Tr. 71-75; Pl.'s Ex. 4; Defs.' Exs. 1, 2.) The Court finds Defendant Vandermark's testimony, supported by photographic evidence, more credible on this point.

[9] Defendant Vandermark testified as to her belief that, for both the tables located in the pod and in Dining Hall A, wheelchairs could "roll over the top of the stool itself that's on the table, to where the stool would be underneath the seat of their wheelchair." (Tr. 77-78.) Defendant Vandermark later admitted that "it would depend on the type of the wheelchairs" as to whether they could roll over the stools, but she believed that "[t]he majority of them, as far as I know, they are -- they do roll over the stools." (Tr. 79.) The Court finds Plaintiff's testimony as to whether his specific wheelchair fits over the stools in Dining Hall A more credible.

[10] One inmate testified that because he uses a wider, bariatric wheelchair, he remains about an arms-length away from the table when sitting in his wheelchair at the table between two stools. (Tr. 49.) But other inmates testified that they can maneuver their wheelchair between two built-in stools and reach the table. (Tr. 54, 58, 61.)

5

similar in style to those in Dining Hall A, with four, stationary stools attached to it. (Tr. 22, 29, 43, 71, 78; Pl.'s Exs. 4, 6.)

18. No tables in Pod 1A have stools cut off for wheelchair accessibility. (Tr. 29, 51, 68-69, 78.)

19. The tables in Pod 1A vary in height, and three[11] tables have stationary stools lower to the ground. (Tr. 35.) At those lower tables, Plaintiff can slide his wheelchair over each of the four stools.[12] (Tr. 35, 36; *see also* Defs.' Ex. 3.)

20. When Plaintiff slides his wheelchair over a stool at a low table, a crossbar on his wheelchair prevents him from getting but so close to the table. (Tr. 12.) When sitting over the stool in his wheelchair, Plaintiff cannot get closer than 13.5 inches to the edge of the table. (Tr. 12, 25, 26, 36; Pl.'s Ex. 5.)[13] Plaintiff

---

[11] At times, Plaintiff testified that he thought there were two lower tables in the pod. (Tr. 25, 29.) Plaintiff later said "about three tables" in Pod 1A have low stools. (Tr. 35.) Another wheelchair-bound inmate in Pod 1A testified that four tables in the pod are "lower." (Tr. 43.)

[12] Plaintiff testified he cannot roll his wheelchair over any stool at the other "high" tables. (Tr. 36.) Rhonda Langford, the Sussex II Operations Manager, testified that she used a "standard issue wheelchair" from the pod and was able to sit in the wheelchair over the built-in stool at two separate tables. (Tr. 83, 84-85.) She testified she tried two tables in the pod, one which she believed was a higher table and the other a lower table. (Tr. 87, 88, 93, 107.) But Langford acknowledged that she "didn't realize [Pod 1A] had so many different size tables on the pod" (Tr. 104), she did not know how many tables were low versus high ones (Tr. 106-07), and "the tables to [her] looked all the same size" (Tr. 108). Because Langford acknowledges that she did not attempt to roll the wheelchair over the stools at every table and that she did not know the tables were different sizes (Tr. 106-07), the Court finds Plaintiff's testimony more credible.

[13] Other witnesses similarly testified that they could pull their wheelchair up over stools at certain tables in Pod 1A but could only get so close to the table— about a foot or so away. (Tr. 41-42, 59.) When seated like this, Defendant Vandermark testified that from her observations inmates did not appear to be sitting farther away from the table than they would be if they were sitting on the stool itself. (Tr. 79.) She testified that the inmates she has observed sitting at the table in this manner were able to reach the table. (Tr. 82.) However, she estimated that if she were sitting directly on the stool, she would be about "6 to 8 inches from the table." (Tr. 79.) Langford presented video evidence of her sitting in a wheelchair and sliding the wheelchair over the built-in stool. (Defs.' Ex. 3.) Langford admitted that she did not know whether the wheelchair she used had crossbars underneath it similar to Plaintiff's wheelchair. (Tr. 109.) Langford testified, and the video shows, that she could reach the table when sitting in the wheelchair over the built-in stool. (Tr. 84; Defs.' Ex. 3.) Specifically, she testified that her wheelchair "went all the way on the stool. It covered the stool. The stool was actually up underneath my seat." (Tr. 94.) But consistent with Plaintiff's testimony, the video shows that the front edge of Langford's wheelchair lines up with the front of the stool but goes no further. (Defs.' Ex. 3.) In the video, Langford

6

states he has "to scoot up in the wheelchair in order to get close to the table." (Tr. 11.)

21. Similar to the tables in Dining Hall A, Plaintiff can also maneuver his wheelchair between each of the stools at all of the tables located in Pod 1A. (Tr. 38, 54, 61, 78.) But Plaintiff contends when he sits in his wheelchair at the side of a table between two stools, "there's no way anybody can sit" in the stools on either side of his wheelchair. (Tr. 13; Pl.'s Ex. 9.)[14] "So [he's] messing up exactly two places where somebody else could sit." (Tr. 13.)

22. Again, Plaintiff can also sit on top of a stool without the use of his wheelchair, "but most of the time [he] stay[s] in the wheelchair." (Tr. 34; *see also* Tr. 86; Pl.'s Ex. 7.)

23. Plaintiff requests as an accommodation that the stools be cut off so wheelchair bound inmates "can get up close to the table like we're supposed to be, instead of 13 and a half inches from it, where we can sit comfortably in a wheelchair, instead of scooting all the way up to the front of the wheelchair in order to, you know, be close to the table to use, use the table." (Tr. 12; *see also* Tr. 13 ("I just need them cut off so I can access the tables like I should.").)

## IV. ANALYSIS

### A. Plaintiff Concedes that Claim Four (c), Regarding His Access to the Microwave, Should Be Dismissed as Moot

The parties both acknowledged at the evidentiary hearing that the prison lowered the position of the microwave in Pod 1A prior to the evidentiary hearing. Plaintiff (as well as his witnesses) confirmed that, in its lowered position, Plaintiff can use the microwave while sitting in his wheelchair. Plaintiff testified that Claim Four (c) has been resolved to his satisfaction and that he no longer wished to pursue that claim. Moreover, given the prison's decision to lower the microwave voluntarily, Plaintiff has already received the benefit of the injunctive relief to which he might otherwise have been entitled under Claim Four (c)—an order that the prison provide Plaintiff with meaningful access to the microwave in Pod 1A. Therefore, the Court RECOMMENDS that Plaintiff's Claim Four (c) be DISMISSED AS MOOT.

### B. Claim Four (d) Fails Because Plaintiff Has Meaningful Access to Tables and Cannot Show Intentional Discrimination or a Failure to Provide a Reasonable Accommodation

Plaintiff has failed to demonstrate that he was denied meaningful access to the tables in Dining Hall A or in Pod 1A because of his disability. Therefore, Claim Four (d) should be dismissed.

---

then leans forward in the wheelchair and is able to rest her forearms on the table. (*Id.*)

[14] Other witnesses also confirmed they could sit in their wheelchairs at the edges of the table between the built-in stools "if nobody else is sitting at the [stools on the] left and right." (Tr. 41.) For example, Plaintiff's Exhibit 7 shows an inmate in a wheelchair sitting at the table and between two built-in stools on the far-left side of the image. (Tr. 43; Pl.'s Ex. 7.) But the location of the wheelchair "tak[es] up both left and right seats." (Tr. 43.)

7

As an initial matter, for each table in Dining Hall A and Pod 1A, Plaintiff concedes that his wheelchair fits between the built-in stools. Sitting in this position, Plaintiff can maneuver his wheelchair in front of four of the eight sides of the tables and reach the tabletop. This creates at least four wheelchair accessible spots for Plaintiff at each table. Plaintiff contends that sitting in these spots makes it so that other inmates cannot occupy the two stools immediately adjacent to his wheelchair. But inmates would still be able to sit at the other two stools, or other wheelchair-bound inmates could sit at the three remaining spots between the built-in stools. In any event, Plaintiff's wheelchair blocking two seats at built-in stools does not deprive *Plaintiff* of meaningful access to the tables.

In addition to those four wheelchair accessible spots at each table, Plaintiff can maneuver his wheelchair *over* the stools at the three low tables in Pod 1A. This creates 12 additional seats in Pod 1A where Plaintiff can sit in his wheelchair and over the stool. Plaintiff argues that when seated over these stools, the crossbar of his wheelchair prevents him from getting closer than 13.5 inches away from the edge of the table because the front of his wheelchair seat lines up with the front of the stool. (Pl.'s Ex. 5.) Plaintiff contends that because he cannot scoot the wheelchair forward any further, he must sit up in his wheelchair to reach the table. This, he argues, deprives him of meaningful access to the table. The Court does not find this argument persuasive because inmates who sit directly on top of the stools without a wheelchair similarly cannot move the stools closer to the table given their stationary nature. *See Boston v. Dart*, No. 14-CV-8680, 2016 WL 5373083, at *7 (N.D. Ill. Sept. 26, 2016) ("That [the plaintiff] found the tables awkward to use is an insufficient basis from which any reasonable jury could conclude that [the prison] violated the ADA.").

Next, in Dining Hall A, three tables each have one stool removed for wheelchair accessibility. This creates three additional spots available to Plaintiff in Dining Hall A.

Finally, the Court finds that despite Plaintiff's emphysema, he *can* stand up and move from his wheelchair to a stool, on his own, without assistance. Indeed, Plaintiff chooses to sit directly on the stools on occasion, maybe once a week, according to his own testimony.

In sum, Plaintiff has meaningful access to the tables through: (1) placing his wheelchair between the built-in stools; (2) placing his wheelchair over twelve of the stools located at the lower tables in Pod 1A; (3) sitting in his wheelchair at the three locations in Dining Hall A where built-in stools have been removed; and/or (4) moving from his wheelchair to sit directly on a stool. For these reasons, Plaintiff has not shown that Defendants deprived him of meaningful access to the tables in Dining Hall A or Pod 1A, nor has he shown that they intentionally discriminated against him based on his disability.

Plaintiff also fails to show that he was denied a reasonable accommodation. Plaintiff testified that the accommodation he seeks is the removal of the built-in stools from the tables. Not only is such an accommodation unnecessary to provide Plaintiff meaningful access to the tables, as discussed above, but such an accommodation would also deprive other inmates of seating. Therefore, that requested accommodation is not reasonable. *See Richardson*, 52 F.4th at 619, 621.

### V. CONCLUSION

For the reasons stated above, the Court RECOMMENDS that Claim Four (c) be DISMISSED AS MOOT and Claim Four (d) be DISMISSED WITH PREJUDICE.

(ECF No. 67, at 1–12 (alterations in original)).

The Court further advised Combs that he could file objections to the Report and Recommendation within fourteen (14) days from the date of entry thereof. Pursuant to the Court's direction, counsel certified that a copy of the Report and Recommendation was hand delivered to Combs on August 3, 2023. (ECF No. 68, at 1.) Combs has not filed objections.

### II. Standard of Review

"The magistrate [judge] makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court." *Estrada v. Witkowski*, 816 F. Supp. 408, 410 (D.S.C. 1993) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). This Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). In the absence of a specific written objection, this Court may adopt a magistrate judge's recommendation without conducting a *de novo* review. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 316 (4th Cir. 2005).

## III. Conclusion

There being no objections, and the Court having determined that the Report and Recommendation is correct on its merits, the Report and Recommendation, (ECF No. 67), will be ACCEPTED and ADOPTED. Claim Four (c) will be DISMISSED AS MOOT, and Claim Four (d) be DISMISSED WITH PREJUDICE. The action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

Date: 30 August 2023
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge